WELCH, Judge.
Kaleem Ariff Tariq-Madyun was charged with and convicted of six counts of first-degree robbery, see § 13A-8-41, Ala. Code 1975. The trial court sentenced Tar-iq-Madyun to serve 6 consecutive terms of 25 years’ imprisonment. The trial court ordered Tariq-Madyun to pay an assessment of $300 to the Crime Victims Compensation Fund and to pay court costs, attorney fees, and restitution.
*747 Tariq-Madyun does not challenge the sufficiency of the evidence. The State’s evidence established that employees at six restaurants located on or near the Beltline area of Decatur were robbed at gunpoint during a two-month period in the Spring of 2006. The robberies occurred when the restaurants were preparing to open in the morning or to close at night and were committed by a single black man wearing dark clothing and a mask or other covering over his face and carrying a black or dark blue semiautomatic weapon that he pointed at employees in order to obtain the money. The robber typically wore gloves, most often plastic gloves like those foodservers wear. No fingerprints were recovered at any of the crime scenes. Tariq-Madyun was identified as a suspect in the robberies when a shirt obtained near the scene of one of the restaurant robberies that had occurred in October 2005 was found to contain his DNA. When the police stopped Tariq-Madyun for a traffic violation on May 12, 2006, and conducted a consensual search of his car they located .40 caliber bullets, plastic gloves, and several articles of black clothing inside a backpaek in the trunk of the car, and they found a loaded .40 caliber semiautomatic weapon beneath the backseat. A pair of damp shoes was recovered from the vehicle, and the soles of the shoes matched shoe prints left outside one of the restaurants. Two women Tariq-Madyun had been dating during the time the robberies were' committed testified that Tariq-Mad-yun told them that he had committed the restaurant robberies. One of the women, Tiffany Slaughter, testified that after Tar-iq-Madyun was arrested, she threw dark clothing and a wig he had worn during some of the robberies into a dumpster located at her place of employment. Slaughter told the police what she had done, and the police retrieved the items from the dumpster. One of the items recovered from the dumpster was a wig belonging to Tariq-Madyun’s 'second girlfriend, Whykiea Cohn; Cohn identified the wig and explained that it had been missing during the time a wig was used in some of the restaurant robberies. DNA matching Tariq-Madyun’s was detected on some of those items Slaughter had discarded into the dumpster.
I.
Tariq-Madyun argues that the trial court erred when it denied his motion to sever the six counts of robbery and instead tried all of the cases together. His primary argument appears to be that the consolidated trial of all charges prejudiced him because, he says, the jury was overloaded with prejudicial evidence from the multiple counts.
Tariq-Madyun argues at length that Rule 404(b), Ala. R.Evid. P., prohibits the admission of evidence of other bad acts solely to show bad character and that the admission of evidence of another crime must not only be relevant, but its probative value must .also outweigh the danger of unfair prejudice, Rule 403, Ala. R. Evid. Tariq-Madyun’s discussion of, Rules 403 and 404(b), Ala. R.Evid. P., does not address the propriety of consolidation of charges under Rule 13.3, Ala. R.Crim. P., the severance of joined charges pursuant to Rule 13.4, Ala. R.Crim. P., or the burden of proving prejudice from a trial court’s denial of a defendant’s motion to sever charges. See Rule 10(g), Ala. R.App. P. However, because Tariq-Madyun also argues that the six counts did not have enough in common to establish a pattern or common scheme, we will address whether the trial court erred when it denied the motion to sever.
The State charged Tariq-Madyun in a single indictment with six counts of robbery. Tariq-Madyun filed a pretrial mo *748 tion to sever the counts and argued in that motion that it would be prejudicial to try the multiple robbery cases at one time. (C. 139.) The trial court conducted a hearing on Tariq-Madyun’s motion to sever. Tariq-Madyun argued that the only connection among the robberies was that each was committed by a single black man and that factor, he argued, was not sufficient to establish a signature crime warranting a trial of all the cases together. Investigator Chris Jones with the . Decatur Police Department testified at the hearing that the common characteristics of each of the robberies were that the robber was. a stocky black male wearing dark clothes and concealing his face; that the robber wore plastic surgical or food-preparation gloves; that the robber carried a black semiautomatic handgun; that he targeted restaurants; that as soon as the robber entered the restaurant, he singled out one employee, pointed the gun at that person, and attempted to complete the robbery with that person, rather than pointing the gun at first one employee and then another; the robber brought a white or off-white pillowcase or bag to the restaurants and forced the employees to place the money in the pillowcase or bag; and the robber left the crime scenes on foot. Investigator Jones testified that he had “never worked a case where [the perpetrator] actually wore surgical gloves.” (R. 32.)
The evidence established that the robberies took place on March 5, 2006; March 13, 2006; March 16, 2006; April 1, 2006; April 5, 2006; and May 7, 2006. Investigator Jones testified that other similar restaurant robberies had occurred in Huntsville and Madison during this general period of time. Investigator Jones testified that officers spoke with Tariq-Mad-yun’s girlfriends, Tiffany Slaughter and Whykiea Cohn, and both stated that Tar-iq-Madyun had told them that he was committing the robberies. Slaughter told officers that Tariq-Madyun drove her to a restaurant in Decatur and identified the business as one he had robbed. The robber of the Decatur restaurants used a wig during some of the robberies, Investigator Jones said, and he stated that Cohn had told officers that she had owned a wig but that she could not find the wig during part of the time in which the robberies occurred.
Investigator Jones further testified that when the vehicle Tariq-Madyun was driving was stopped on May 12, 2006, numerous items were found inside the trunk, including: a clear plastic glove, live rounds of .40 caliber ammunition, a light green pillowcase, and a dark blue backpack. Among the items found inside the backpack were: two clear latex gloves; black socks; a damp pair of black tennis shoes with grass on them; a long-sleeved black turtleneck shirt; a beige pillowcase; a black knit glove and a blue knit glove; a black toboggan cap; a damp pair of black Dickie brand pants; and .40 caliber rounds of ammunition. Investigator Jones testified that beneath the rear passenger-side seat officers found additional items, including: a Glock brand .40 caliber handgun; black pants; blue sweatpants; a black toboggan; a black windbreaker jacket; a white pillowcase; and one box of clear plastic gloves. Investigator Jones further testified that items recovered from a dumpster behind Tiffany Slaughter’s place of employment included: a brownish-black wig; white socks; black sweatpants; and two black t-shirts.
Finally, Investigator Jones testified that during the investigation of the robberies, he sent a message to law-enforcement agencies in the surrounding area inquiring whether they had had any similar robberies in their jurisdictions, and that an investigator in Madison City had contacted him about a clear plastic glove and a black *749 shirt that had been recovered by a tracking dog on a fence line close to the interstate following a restaurant robbery in Madison. Investigator Jones testified that forensic analysis revealed that DNA obtained from the shirt matched Tariq-Mad-yun’s DNA profile.
After considering the testimony and the arguments of counsel, the trial court denied Tariq-Madyun’s motion to sever, and stated that the six robberies were of a similar character, that they appeared to have a connection as far as their commission, and that they arguably were part of a common scheme or method of operation. The court further stated that it had no basis to sever any of the counts from one another. (R. 50.)
Rule 13.3(a), Ala. R.Crim. P., provides, in relevant part:
“(a) Offenses. Two or more offenses may be joined in an indictment, information, or complaint, if they:
“(1) Are of the same or similar character; or
“(2) Are based on the same conduct or are otherwise connected in their commission; or
“(3) Are alleged to have been part of a common scheme or plan.” .
(Emphasis added.)
Rule 13.4, Ala. R.Crim. P., provides that a trial court may order separate trials of offenses joined in an indictment if it appears that a defendant would be prejudiced by the joinder of offenses. We review a trial court’s ruling on a motion to sever for an abuse of discretion.
“This Court noted in Summerlin v. State, 594 So.2d 235, 236 (Ala.Cr.App.1991), that ‘the granting of a severance rests within the discretion of the trial court and its refusal to sever counts ... will only be reversed for a clear abuse of discretion.’
“ ‘The burden of proof is on the defendant to demonstrate specific and compelling prejudice which the trial court cannot protect against and which causes him to receive an unfair trial. United States v. Butera, 677 F.2d 1376, 1385 (11th Cir.1982), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). It is only the most compelling prejudice, against which the trial court will not be able to afford protection, that will be sufficient to show the court abused its discretion in not granting a severance. United States v. Perez, 489 F.2d 51, 65 (5th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Moreover, a defendant seeking to overturn a denial of severance must demonstrate specific prejudice which resulted from the denial. United States v. Walker, 456 F.2d 1037, 1039 (5th Cir.1972). A mere showing of some prejudice is insufficient. United States v. Wilson, 657 F.2d 755, 765 (5th Cir.1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); United States v. Staller, 616 F.2d 1284, 1294 (5th Cir.), cert. denied, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).’
“Hinton v. State, 548 So.2d 547, 555 (Ala.Crim.App.1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).”
Minnis v. State, 690 So.2d 521, 524-25 (Ala.Crim.App.1996). Moreover, this Court has stated, “No prejudice results where, as here, the jury could easily separate the evidence of the separate crimes.” Summerlin v. State, 594 So.2d 235, 236-37 (Ala.Crim.App.1991).
Tariq-Madyun has failed to demonstrate or even allege any specific prejudice that resulted from the trial court’s failure to sever the counts of the indictment. As *750 noted above, Alabama law places upon an appellant the burden to prove that he suffered specific and compelling prejudice in order to secure a reversal based on the trial court’s ruling on the motion to sever. E.g., Ex parte Hinton, 548 So.2d 562, 566 (Ala.1989)(under, former Rule 15.3, Ala. R.Crim. P. Temp,). In Hinton v. State, 548 So.2d 547 (Ala.Crim.App.1988), aff'd by Ex parte Hinton, supra, this Court explained the most common forms of prejudice that might result from improper joinder:
“ ‘With respect to prejudice of the defendant, it is [generally] likely to fall into one of three categories: “(1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evi-dénce of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately it would not so find.” ’
“2 LaFave and Israel, ... Criminal Procedure at § 17.1(c) [(1984)].”
548 So.2d at 555. Tariq-Madyun has made only a bare claim that the State combined all six counts for trial in order to overload the jury with prejudicial evidence and to convince the jury" to convict him based on the number of charges against him. He cites nothing from the record in this case to support this vague claim. Nothing from the record demonstrates that the jury was either overloaded with prejudicial information or that its verdicts were based on anything other than the evidence presented as to each count. Tar-iq-Madyun’s generic allegation does not establish the “specific and compelling prejudice” necessary to warrant the reversal of the trial court’s decision here.
“His bare allegation that, if the jury were to believe that he was involved in one bank robbery, then it might also (improperly) be led to believe from that fact alone that he was involved in the other, is simply not enough. This type of spillover is standard fare whenever counts involving discrete incidents are linked in a single indictment. We have repeatedly held that such a garden variety side effect, without more, is insufficient to require severance. See United States v. Boylan, 898 F.2d 230, 246 (1st Cir.) (collecting cases), cert. denied, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). Moreover, the case for prejudice is especially weak in this instance because the district court’s jury instructions delineated the separateness of the three counts and made it clear that the jury had to consider each charge on its own merits.”
United States v. Taylor, 54 F.3d 967, 974 (1st Cir.1995).[1]
As was the case in United States v. Taylor, we note, too, that the trial court here instructed the jury thoroughly about its duty to consider each case separately and to determine whether the State had met its burden of proof beyond a reasonable doubt. (R. 674-80.) “These instructions ‘minimized any possible prejudice’ from the joinder” of the separate counts. United States v. Melendez, 301 F.3d 27, 36 (1st Cir.2002), quoting United States v. Natanel, 938 F.2d 302, 308 (1st Cir.1991).
We find additional guidance for analysis of Tariq-Madyun’s assertion of prejudice *751 from this Court in Hinton v. State, supra. Hinton argued that the trial court had erred when it consolidated two capital-murder cases for trial and then failed to grant his, motion to sever the charges. The Court first determined that the cases were properly consolidated and. then considered whether the consolidation was so prejudicial as to deprive Hinton of a fair trial, and it held that no prejudice resulted to Hinton. The Court stated:
“As the defendant’s defense to both charges was the same, i.e., mistaken identity, there was no chance that he could have become embarrassed or confounded by presenting separate defenses. Moreover, where, as in the instant case, the nature of the offenses or of the evidence is not of such a character or is not so complicated that a jury could not reasonably be expected to separate the indictments and to evaluate the evidence properly and individually on each separate charge, the severance motion is due to be denied. United States v. Harris, 458 F.2d 670, 673 (5th Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). Neither does mere speculation that the jury will not follow the instructions of the trial court with respect to compartmentalizing the evidence justify a severance. United States v. Borish, 452 F.Supp. 518, 524 (E.D.Pa.1978). Nor is severance justified on the grounds that the jury will cumulate evidence introduced on all counts unless prejudice flowing from consolidation of the indictments is clearly heyond the curative powers of cautionary instructions by the trial court. United States v. Morrow, 537 F.2d 120, 136 (5th Cir.1976), cert. denied, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977).
“In the instant case we find that the defendant has failed to demonstrate the requisite specific and compelling prejudice as a result of the joint trial of the two indictments, especially in light of the fact that had these two cases been tried separately, in each trial evidence of the other charged crime would have been admissible under the plan, design, scheme, or system and identity exception to the general exclusionary rule. Nicks v. State, 521 So.2d 1018, 1025-28 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.1988).”
548 So.2d at 555-56.
As in Hinton v. State, Tariq-Madyun failed to establish that he suffered any specific and compelling prejudice, and his argument that the trial court abused its discretion in denying the motion to sever necessarily fails. Tariq-Madyun denied committing any pf the robberies, so there was no chance that he could have become embarrassed or confounded by presenting separate defenses. Moreover, the evidence presented — although extensive— was not complicated, and .the jury could reasonably have been expected-to separate the evidence as to each robbery and to evaluate the evidence individually on each charge. Tariq-Madyun’s bare allegation that the State tried the charges together to overwhelm the jury and to convince the jury to convict him based on the number of charges and not the evidence was sheer speculation and was unsupported by the record. See United States v. Saadey, 393 F.3d 669, 679 (6th Cir.2005) (although the appellant alluded to the cumulative effect of the evidence on the jury, “an unproven assertion is not compelling evidence of actual prejudice”). Tariq-Madyun has not sustained his burden to establish specific and compelling prejudice resulting from the trial court’s failure to sever the charges. Therefore, Tariq-Madyun also has not established that the trial court abused its discretion when it declined to *752 sever the eases for trial, and he is not entitled to relief on his claim of error.
“We need not decide whether these charges were improperly joined, because we find no compelling prejudice arose in any event.” United States v. Dowd, 451 F.3d 1244, 1249 (11th Cir.2006). Nonetheless, we note in addition to Tariq-Mad-yun’s failure to establish specific and compelling prejudice as a result of the trial court’s ruling on the motion to sever, join-der of the offenses in a single indictment and a consolidated trial were proper under the circumstances of this case. The trial court determined, after considering the evidence and arguments presented at the hearing on Tariq-Madyun’s motion to sever, that the robberies were of a similar character, that they were connected in their commission, and that they were part of a common scheme or plan. We agree.
This Court examined the principles regarding consolidation of criminal cases of a same or similar character in Hinton v. State, supra, because the trial court had consolidated two capital-murder cases involving night managers at restaurants who had been robbed and then murdered. The Court determined that consolidation was proper because in both crimes the night managers of fast-food restaurants were robbed and then murdered. The managers were forced into the coolers of the restaurants and shot twice in the head with the same gun, the restaurants were in generally the same part of Birmingham and were near a major expressway or interstate, both Crimes occurred when the night managers were alone, the robber sought large amounts of cash in the safe— leaving the victims’ wallets untouched, and the robber left no fingerprints. The Court stated that it was obvious that the defendant had a common plan and that the circumstances presented a classic case for joinder. The Alabama Supreme Court agreed that joinder of the two crimes had been proper, stating:
“Joinder, and thus consolidation, is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness. United States v. Werner, 620 F.2d 922, 926 (2d Cir.1980). The Court of Criminal Appeals has recently indicated that the most important consideration in determining whether crimes are similar is whether one offense would have been admissible in the trial of the other. Nickerson v. State, 523 So.2d 504, 506-07 (Ala.Crim.App.1987) (relying on Wright, Federal Practice and Procedure, Criminal 2d, § 143 (1982)). These crimes had many common elements and were almost identical in detail; evidence of each one would have been admissible in the trial of each of the others to establish identity. The identity exception to the general collateral crime exclusionary rule applies where ‘the circumstances of the charged and noncharged crime exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.’ Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.), cert. denied, 440 So.2d 1155 (Ala.1983). The only real difference between the two charged crimes and [a third] robbery was that the victim in the [third robbery] case survived.”
Ex parte Hinton, 548 So.2d at 566. See also United States v. Taylor, 54 F.3d at 973 (“In determining whether counts are properly combined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred.”); and Unit *753 ed States v. Boulanger, 444 F.3d 76, 87 (1st Cir.2006) (“Joinder is proper if the offenses charged ‘are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.’ Fed.R.Crim.P. 8(a). We have construed this rule generously in favor of joinder. [United States v.] Meléndez, 301 F.3d [27,] 35 [(1st Cir.2002)]. Further, ‘ “[sjimilar” does not mean “identical,” and we assess similarity in terms of how the government saw its case at the time of indictment.’ Id. (citing United States v. Edgar, 82 F.3d 499, 503 (1st Cir.1996)).”).
Relevant to our conclusion that the robberies were properly consolidated is the consideration of whether evidence of each offense would have been admissible in the trial for the other offenses, if the charges had been tried separately. E.g., Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003). This Court in Lewis set forth the established principles regarding admission of other “bad act” evidence:
“ ‘On the trial for the alleged commission of a particular crime, evidence of the accused’s having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused’s conformity therewith. This is a general exclusionary rule which prevents the introduction of pri- or acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime or act was committed before or after the one for which the defendant is presently being tried....
[[Image here]]
“ ‘The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show' the defendant’s bad character and conformity therewith on the occasion of the now-charged crime. If the defendant’s commission of another, crime or misdeed is relevant for some other material purpose in the case then it may be admitted.’
“C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed. 1996) (footnotes omitted). The other purposes for which collateral-crimes evidence may be admissible, i.e., the exceptions to the exclusionary rule, include:
“ ‘ “(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the-res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.” ’
“Nicks v. State, 521 So.2d 1018, 1026 (Ala.Crim.App.1987), aff’d, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), quoting Nelson v. State, 511 So.2d 225, 233 (Ala.Crim.App.1986), aff’d, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). These exceptions do not apply unless ‘there is a real and open issue as to one or more of those “other purposes.”’ Bowden v. State, 538 So,2d 1226, 1227 (Ala.1988). Furthermore, the common plan, scheme, or design exception is ‘essentially coextensive with the identity exception,’ Ex parte Darby, 516 So.2d 786, 789 (Ala.1987), and ‘applies only when identity is actually at issue.’ Campbell v. State, 718 So.2d 123, 128-29 (Ala.Crim.App.1997), cert. denied, 525 *754 U.S. 1006, 119 S.Ct. 522, 142 L.Ed.2d 433 (1998).”
Lewis, 889 So.2d at 661.
Clearly, the six offenses were of the same or similar character — they all involved first-degree robberies of restaurants located in the same region of the city, and they occurred within a two-month period. Furthermore, the evidence indicated that the robberies were connected and were part of a common scheme or plan.'
The tactics, or modus operandi, employed by the robber in each case were peculiarly distinctive and similar in that the robber targeted restaurants in the same area of Decatur and at opening or closing time when the employees were busy with tasks related to opening and closing, and when few or no customers were present. The robber in each case used a dark — either a black or dark blue— semiautomatic handgun to force a single employee to turn over the restaurant’s cash receipts, and he walked away from each crime scene. No fingerprints were left at any of the crime scenes. The robber — in each case described by witnesses as a black male — wore dark clothing and concealed his face with some sort of a mask, a hat pulled down to his eyes, or a bandanna. The witnesses in five of the restaurants also described the robber as wearing gloves — most often plastic gloves — and they said he brought a pillowcase or bag with him and that he put the money into the bag before he walked away.
For at least part of the time during which the robberies took place, Tariq-Madyun lived with one of his girlfriends, Whykiea Cohn, in the area where the robberies occurred. Testimony at trial established that Tariq-Madyun had told his other girlfriend, Tiffany Slaughter, that he had fobbed the McDonald’s fast-food restaurant in Decatur and he showed her money that he said he had taken during the robbery. Slaughter testified that she had seen him put on a turtleneck shirt and a wig on the day of the robbery; Tariq-Madyun told her that he had worn the wig during the robbery and he had pulled the turtleneck up to hide his face. He told her he was “hitting their asses in Decatur,” meaning that he was committing robberies.
Items of evidence consistent with items déscribed by the witnesses, including a semiautomatic weapon, pillowcases, black clothing, and gloves — including vinyl or latex gloves — were recovered in the vehicle Tariq-Madyun was driving when he was stopped by police. The soles of a pair of shoes recovered from the car matched the shoe prints from one of the robberies. Other items of evidence consistent with that reported by the crime-scene witnesses — including black clothing, gloves, and a wig — were found inside a dumpster after Tiffany Slaughter told police she had discarded the items Tariq-Madyun had worn on the day of the robbery of the McDonald’s fast-food restaurant.
Whykiea Cohn testified that Tariq-Mad-yun had told her that he had robbed five restaurants in Decatur and told her which restaurants. She testified that he told her that he walked to and from the restaurants and that he used a black gun during the robberies.
The trial court correctly determined that the robberies were connected and were part of a common plan or scheme to commit robberies of restaurants in the Beltline area while the employees were distracted with duties associated with opening or closing the restaurant, to subdue the employees with a semiautomatic weapon, to quickly obtain the money by forcing one employee to provide the receipts, to leave ho fingerprints or other means of identification, and to walk away in the dark. *755 These kinds of similarities have been found to constitute a common plan or scheme. See, e.g., Hinton v. State, supra; Gagliardi v. State, 695 So.2d 206 (Ala.Crim.App.1996) (two robberies were of. a similar character and were part of a common plan because on two consecutive nights, a man entered “all-night” businesses that were in close proximity to one another at approximately 4:30 a.m. to 5:00 a.m., showed the clerk the butt of a gun beneath his jacket to intimidate the clerk, took money, and then slowly walked away).
Furthermore, each crime would have been admissible in the trial of the other under the identity exception to the exclusionary rule. Rule 404(b), Ala. R.Evid. P. In Gagliardi v. State, 695 So.2d at 208, the Court concluded that evidence of one robbery would have been admissible in a trial of the second robbery and explained:
“This exception to the ‘“general exclusionary rule only becomes applicable when the identity of the person who committed the now-charged crime is in issue.”’ Thomas v. State, 409 So.2d 955, 957 (Ala.Cr.App.1981), quoting C. Gamble, McElroy's Alabama Evidence, Section 69.01(8) (4th Ed. 1991). .During cross-examination of several state witnesses, defense counsel placed the appellant’s identity in issue by questioning those witnesses as to possible mistaken identity, specifically regarding the clothes that the appellant was wearing and his overall appearance. Based on Thomas and Nickerson [v. State, 523 So.2d 504 (Ala.Crim.App.1987)], evidence of each of these crimes would be admissible in the trial of the other; therefore, we hold that the trial court did not err in consolidating the two robbery charges.”
The same can be said for this case. Defense counsel cross-examined the witnesses and challenged their observations and descriptions of the robber, and Tariq-Madyun’s identity was a real issue in the case. Furthermore, as noted in the discussion above, the offenses were committed in a novel or peculiar manner. The collateral-act evidence would have been admissible in separate trials under the identity exception to the exclusionary rule.
In summary, Tariq-Madyun failed to sustain his burden of proving that the trial court’s denial of his motion to sever resulted in specific and compelling prejudice that resulted in an unfair trial. Moreover, he would not have been able to prove such prejudice because consolidation of the robberies for trial was proper. Therefore, Tariq-Madyun is not entitled to any relief on this claim of error.
II.
Tariq-Madyun next argues that evidence of a collateral crime, the robbery of a Hardee’s fast-food restaurant in Madison, should not have been admitted because, he says, “the robbery in Madison was not similar enough to the crimes in Decatur.” (Tariq-Madyun’s brief, at p. 15.) As best we can understand, Tariq-Madyun is arguing that the evidence was not admissible under the identity exception to Rule 404(b), Ala. R.Evid., because it was not sufficiently similar, to the charged crimes.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). The rule applies to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). This issue is governed by application of the principles set forth in Part I of this opinion, especially Lewis v. State, 889 So.2d 623 *756 (Ala.Crim.App.2003), and Gagliardi v. State, 695 So.2d 206 (Ala.Crim.App.1996). Briefly stated, we must determine whether the trial court abused its discretion when it determined that evidence of the collateral act — the robbery of the Madison Hardee’s fast-food restaurant — was admissible as an exception to the general exclusionary rule, particularly to show identity or common plan, design, or scheme. We hold that the trial court did not abuse its discretion.
The prosecutor presented the testimony of Kevin Sharp, the general manager of the Hardee’s fast-food restaurant on Madison Boulevard in Madison when it was robbed in October 2005. Sharp testified that the restaurant was located near Interstate 565. He stated that the restaurant opened at 4:00 a.m. and that on the morning of the robbery, between 5:00 and 5:30 a.m., he was in the office changing the store’s videotape. Sharp said he heard two employees scream, and he looked out the office door and saw a black man wearing all-black clothing and carrying a black semiautomatic weapon in the restaurant. The robber was wearing a fleece jacket with the collar zipped up over his mouth and nose, and he was wearing a black toboggan cap pulled down so only his eyes were visible. The robber was wearing latex surgical or food-preparation gloves. The robber told Sharp to get the money from the safe, and he followed Sharp to the safe at the front of the store. The robber pointed the gun at Sharp as they walked. When Sharp opened the safe, the robber told him to put the money into the bag he had brought with him. Sharp described the bag as a cloth bag, but it was not a pillowcase, he said. Sharp placed the money in the bag and, without saying anything else, the robber walked to the side.door and left the restaurant. Sharp testified that he walked to the front door and looked out; all of his employees were next-door at a McDonald’s fast-food restaurant and they called to him, so he ran over to them. Sharp said that as he went to the McDonald’s, he saw the robber running behind the building and toward the interstate. -
After’ considering Sharp’s testimony, the trial court stated, in relevant part:
“I’ve listened to what he has testified to about this incident in Madison, and when you look at this in terms of whether or not these look to be signature type offenses, whether they’re peculiar, they’re unique or different — I mean or similar in many ways, consider this: Every one of them involved a food service business. Every one of those businesses were located — well, six of them, when you think of Decatur, they were all located within probably five miles max in considering the one out at Priceville. The one in Madison would be less than 20 miles away. Every incident occurred in the early morning hours around when the restaurant was opening or in the late night hours after closing. Every one of them involved — has been described as being perpetrated by a black male who was alone with no accomplice or no support. Every one of them were directed — or the robber was directed — or directed the employees to an office or to a safe, trying to get money out of the safe or an office. All but in one instance the robber had on all black or all dark clothing. In every instance the robber brought a bag for carrying away the money. In every instance it involved a black handgun that was not a revolver. There may be other things that I have missed, but those have just come off the top.
“If that’s not signature, I don’t know what is. And I’m satisfied that under the circumstances, the testimony as to what occurred at the — allegedly oc *757 curred at the Hardee’s in Madison will be admitted in the trial of this case.”
(R. 351-52.)
“[EJvidence of a prior crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime ‘exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.’” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983). The common characteristics of the Madison Hardee’s robbery and the characteristics of the robberies for which Tariq-Madyun was being tried were, as noted by the trial court, unique and exhibited a degree of similarity. " In addition to all the characteristics the trial court discussed, we note that in each case the robber left no fingerprints and that he left each restaurant on foot. The similarities between the charged crimes and the collateral crime were so substantial that they could be said to be the work of the same person and could be said to be part of a common plan or scheme. See Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005); Bighames v. State, 440 So.2d 1231 (Ala.Crim.App.1983)(up-holding application of identity exception to admission of similar collateral crimes).
Therefore, Tariq-Madyun’s claim that the robbery of the Madison Hardee’s fast-food restaurant was not similar to the charged crimes is not well taken. We hold that the trial court did not abuse its considerable discretion when it allowed Sharp to testify about the Madison robbery. We are aware that, to be admissible, collateral-act evidence must be relevant and reasonably necessary to the State’s case and its probative value must outweigh its prejudicial effect. E.g., Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005). However, Tar-iq-Madyun does not argue on appeal that the collateral-act evidence was irrelevant, that it was not reasonably necessary to the State’s case, or that it was unduly and unfairly prejudicial — only that it was dissimilar to the charged crimes. Because Tariq-Madyun does not raise these additional claims on appeal, they will not be discussed. We note, however, that the evidence of the collateral robbery was relevant and reasonably necessary to the State’s case, and its probative value outweighed its prejudicial effect.
For the foregoing reasons, Tariq-Mad-yun is not entitled to relief on this claim of error.
III.
Tariq-Madyun next argues that police officers illegally stopped his vehicle for an alleged traffic violation. He claims that the items recovered in the subsequent consensual search of the vehicle should have been suppressed as fruit of the poisonous tree. Specifically, he argues that traffic stop for a seatbelt violation was illegal because, he says, the fact that the shoulder strap was tucked under his arm, and he was not, therefore, in violation of the seat-belt-law. § 32-5B-4, Ala.Code 1975.
Tariq-Madyun raised this objection in the trial court, but only after Officer Chris Moffett testified repeatedly — including during defense cross-examination — that he had initiated a traffic stop of Tariq-Mad-yun’s vehicle because he observed that Tariq-Madyun’s seatbelt was tucked under his arm and was, therefore, improperly fastened, and after he testified that Tariq-Madyun had consented to a search of his vehicle and, in fact, after he testified that the vehicle had been searched. (R. 438-39, 442-43, 446-47, 450-52.) Tariq-Mad-yun’s objection to the allegedly illegal traffic stop was untimely and it preserved nothing for appellate review.
*758 An objection to testimony that is made after the testimony is given is untimely. E.g., Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006); Pace v. State, 766 So.2d 201, 202-03 (Ala.Crim.App.1999)(claim that evidence was illegally obtained was not preserved for review because it was untimely raised—after officer testified regarding the search); Watson v. State, 439 So.2d 762, 769 (Ala.Crim.App.1983) (“To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent.”).
Because Tariq-Madyun did not object to the allegedly illegal traffic stop until after the officer testified in detail about the stop and after he testified that a consensual search took place, no issue regarding the legality of the stop or the evidence found in the subsequent search was preserved for our review.
Even if Tariq-Madyun’s objection had been timely, he would not have been entitled to any relief on his claim that the traffic stop was illegal and that the items found in the vehicle were results of that illegal stop. He argues that he committed no violation of § 32-5B-4, Ala.Code 1975, because, he says, even though the shoulder belt was underneath his arm, there was no evidence indicating that the belt was not “fastened” properly. That is, Tariq-Mad-yun, claims, as long as the buckle of the seatbelt was clipped, the seatbelt was “properly fastened” within the meaning of the statute. When Tariq-Madyun made this argument to the trial court, the court rejected it and stated:
“Well, [defense counsel], if that’s the case, then it’s okay for me to fasten, to pull my harness and just fasten it and sit on it. If what you’re saying is true, that'the only thing that matters is that an officer has to see that it' is actually hooked together down at the waist or down at the base of the seat, then you could do that all day long. I mean, you wouldn’t have to comply with the law. An officer would never be able to charge anybody with not wearing a seat belt.”
(R. 464-65.) The trial court also stated “that properly fastened about the body means just what it says. You wear it and fasten it around the body the way it’s designed to be worn.” (R. 467.) We agree with the trial court.
Section 32-5B-4(a), Ala.Code 1975, provides: “Each front seat occupant of a passenger ear manufactured with safety belts in compliance with Federal Motor Vehicle Safety Standard No. 208 shall have a safety belt properly fastened about his body at all times when the vehicle is in motion.”
“Properly fastened” is not defined in the statute. The interpretation of a statute presents a question of law, and we review that issue de novo. Ex parte Quick, 23 So.3d 67 (Ala.2009). In Soles v. State, 820 So.2d 163 (Ala.Crim.App.2001), this Court stated:
“‘The first rule of statutory construction is that the intent of the legislature should be given effect. Ex parte McCall, 596 So.2d 4 (Ala.1992); Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301 (Ala.1991). However, when possible, the intent of the legislature should be gathered from the language of the statute itself. Dillard, supra. Thus, where the language of the statute is plain, the court must give effect to the clear meaning of that language.’
“Beavers v. County of Walker, 645 So.2d 1365, 1376-77 (Ala.1994). See also Tuscaloosa County Comm’n v. Deputy Sheriffs’ Ass’n of Tuscaloosa County, 589 So.2d 687, 689 (Ala.1991) (‘Words used in [a] statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain *759 language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is clear and unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.’ (citations omitted)).”
820 So.2d at 164-65.
Tariq-Madyun argued at trial and he appears to argue to this Court that a “properly fastened” seatbelt is simply one that is buckled, regardless of how it is worn around the body. The trial court noted the faulty logic of that interpretation because, under that rationale, an occupant of a vehicle could sit on a buckled belt and be in compliance with the statute. We agree with the trial court that such an interpretation would not have been intended by the legislature. Rather, to be “properly fastened,” the lap portion of the seat-belt must be placed across the lap, and the shoulder portion of the belt must be placed across the shoulder. See State v. Massey, 887 N.E.2d 151, 158 (Ind.Ct.App.2008) (“The legislature’s decision to use the word ‘properly' with the phrase ‘about the occupant’s body' leads us to conclude that it intended for an occupant to fasten the lap belt and wear the seatbelt’s shoulder strap across his shoulder to comply with the seatbelt statute.”).
Based on the foregoing analysis, even if Tariq-Madyun had preserved this issue for review by timely objecting at trial to the validity of the traffic stop, he would not be entitled to relief on the claim of error because the traffic stop was properly executed. Tariq-Madyun admitted that the shoulder portion of the seatbelt was under his arm, and we have determined that this was not a “properly fastened” seatbelt.
Tariq-Madyun is not entitled to relief on this claim of error.
IV.
Tariq-Madyun argues that a pair of latex gloves and a shirt with his DNA that were located by a tracking dog following a collateral robbery in Madison should not have been admitted because, he says, the State failed to establish the necessary foundation for admission of the evidence. Specifically, he argues that it was necessary to establish that the tracking dog had been trained to track humans, that the dog could accurately track humans, and that the circumstances surrounding the trailing tended to show that the dog was on the track of the accused when it found the evidence; because the State failed to establish any of the necessary predicate, Tariq-Madyun contends, the shirt and gloves found during the tracking should not have been admitted.
Alabama State Trooper Jason Fox testified that in October 2005 he was employed as a police officer with the City of Madison, and that he was assigned to the canine unit at that time. He explained that his canine partner was “a dual purpose canine” that had been “trained in locating narcotics and also in patrol, which involves tracking, building searches, area searches, article searches.” (R. 377.) Fox testified that he and the dog had been trained; he stated that they completed a 12-week training program that included tracking on fresh ground and article searches. He further explained that when a person walks across a grassy area, dust and particles • of grass were kicked up and then settle back down and that that was what the dog actually tracked. Trooper Fox testified that he had been working with this dog for four years as of October 2005, that he was familiar with the dog, comfortable working with the dog, and experienced in tracking with the dog at that time.
*760 Trooper Fox testified that the officers who initially responded to the robbery call at the Madison Hardee’s fast-food restaurant had requested that a canine be. sent to the area to assist in tracking the suspect. After learning from the officers at the scene that they had seen the robbery suspect run west from the Hardee’s, Trooper Fox deployed his canine to conduct an area search. The tracking dog picked up a track that zigzagged in a southwesterly direction, and that continued toward the interstate. Trooper Fox testified that the dog followed the track to a fence line; Trooper Fox found a black or dark blue jacket or shirt[2] on the top of the fence.
All the foregoing testimony was elicited without objection from Tariq-Madyun.
After Fox testified about the dog’s following the track that led to the discovery of the shirt on the fence, Tariq-Madyun then objected to the predicate for the dog’s tracking abilities. He argued that the dog went to an area and certain clothing was found, but “[a]ll we have now is that the dog could very well have done this at random.” (R. 380.) The trial court overruled the objection and stated, “[A]s I understand it, the dog is following a track. He’s not necessarily tracking a specific individual or the scent of a specific individual, and I think there’s a distinction there_” (R. 381.) Trooper Fox then testified that the dbg had been following a track and that he was following the dog and that he found the shirt as he followed the dog. Trooper Fox also testified that he had already received from the officers at the scene a description of what the robber had been wearing. The witness identified State’s Exhibit 3 as the shirt he found on the fence, and he testified that after he found the shirt, he directed an officer to stand by the shirt so that it would not be disturbed, and he notified investigators about the shirt. Trooper Fox then continued to track with the dog, searching for the suspect.
Trooper Fox testified that he and the dog crossed the fence where the shirt was found and that the dog continued to track. Approximately 100 feet on the other side of the fence, the dog indicated on something in the grass, and Trooper Fox said that he located two surgical gloves where the dog had indicated. Tariq-Madyun then stated an objection of “insufficient predicate,” and the trial court overruled the objection.
Trooper Fox then testified that the dog continued to track to the interstate but lost the, scent. It appeared to Fox that the person might have gotten into a vehicle. An investigator secured the shirt and the gloves, he said.
Tariq-Madyun’s argument that there was no testimony establishing the requirements necessary to admit the evidence found by the dog was not preserved for appellate review because his objection to the alleged lack of predicate came after the testimony about the dog and its tracking. An objection to testimony made after the testimony is given is untimely. E.g., Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006); Pace v. State, 766 So.2d 201, 202-03 (Ala.Crim.App.1999)(claim that evidence was illegally obtained was not preserved for review because it was untimely raised—after officer testified regarding the search); Watson v. State, 439 So.2d at 769 (“To be timely, an objection must be interposed as soon as *761 the ground for the objection becomes apparent.”). See also Allen v. State, 8 Ala.App. 228, 231, 62 So. 971, 972 (1913)(appellant failed to preserve for review objection regarding predicate for testimony about dogs’ trailing of the appellant’s tracks from the scene of the burglary because appellant “failed to object to the questions eliciting or seeking to elicit the evidence of the trailing”). Because Tariq-Madyun’s objection came only after the State had presented substantial testimony about the dog’s training and its years of work with the handler and about its tracking from the scene of the robbery, Tariq-Madyun’s untimely objection preserved nothing for review.
Tariq-Madyun’s objection to the predicate also came after Trooper Fox had already testified about finding the shirt on the fence, and Tariq-Madyun did not move to strike that testimony. For that additional reason, Tariq-Madyun preserved nothing for review with regard to Fox’s discovery of the shirt that was later determined to contain Tariq-Madyun’s DNA, thus connecting him to the restaurant robberies.
Even if Tariq-Madyun’s objection to the predicate for the dog’s tracking had been timely and had preserved any claim as to the shirt and/or the latex gloves, Tariq-Madyun would not be entitled to relief because the State presented a sufficient foundation supporting the admission of the testimony and the evidence related to the dog tracking.
“In Alabama, ‘[t]he admissibility of dog-tracking evidence upon a proper predicate has been recognized ... for over a century. See Burks v. State, 240 Ala. 587, 200 So. 418 (1941); Orr v. State, 236 Ala. 462, 183 So. 445 (1938); Loper v. State, 205 Ala. 216, 87 So. 92 (1920); Gallant v. State, 167 Ala. 60, 52 So. 739 (1910); Hargrove v. State, 147 Ala. 97, 41 So. 972 (1906); Richardson v. State, 145 Ala. 46, 41 So. 82 (1906); Little v. State, 145 Ala. 662, 39 So. 674 (1905); Hodge v. State, 98 Ala. 10, 13 So. 385 (1893); Holcombe v. State, 437 So.2d 663 (Ala.Crim.App.1983); Moore v. State, 26 Ala.App. 607, 164 So. 761 (1935); and Allen v. State, 8 Ala.App. 228, 62 So. 971 (1913).’ Gavin v. State, 891 So.2d 907, 971 (Ala.Crim.App.2003). In Gavin, this court established the proper predicate for the admission of dog-tracking evidence. Id. Specifically, this court held that dog-tracking evidence is admissible if the State establishes ‘the training and reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the tracking by the dog.’ Gavin, 891 So.2d at 971. See also State v. Montgomery, 968 So.2d 543, 550 n. 6 (Ala.Crim.App.2006) (reiterating the three foundational requirements for the admission of dog-tracking evidence); State v. Neeley, 143 Ohio App.3d 606, 630-31, 758 N.E.2d 745, 764 (2001) (holding that the State may establish the predicate for dog-tracking evidence by showing ‘the training and reliability of the dog, the qualifications of the person handling the dog, and the circumstances surrounding the trailing by the dog....’); McDuffie v. State, 482 N.W.2d 234, 237 (Minn.Ct.App.1992) (same requirements); Rule 702, Ala. R. Evid. (‘A witness qualified as an expert by knowledge, skill, experience, training, or education, may testify ... in the form of an opinion or otherwise.’). This court further explained that ‘[t]he foundational evidence need not be overwhelming or specific, but must be sufficient to indicate reliability of the evidence.’ Gavin, 891 So.2d at 971 (citing Burks v. State, 240 Ala. 587, 200 So. 418, 419 (1941)). See also Montgomery, 968 So.2d at 550 n. 6 (same).”
*762 Vanpelt v. State, [Ms. CR-06-1539, Dec. 18, 2009] — So.3d -, - (Ala.Crim.App.2009).
Trooper Fox testified that he and the dog had completed a 12-week training program that included tracking on fresh ground and article searches and that the dog had been trained “in patrol, which involves tracking, building searches, area searches, article searches.” (R. 377.) Trooper Fox testified that he had been working with this dog for four years as of October 2005 and that he was familiar with the dog, comfortable working with the dog, and was experienced in tracking with the dog at that time. Trooper Fox also testified about the circumstances surrounding the tracking,' and explained that the dog was deployed to conduct an area search based on information provided by the officers at the scene regarding the direction in which the suspect had been seen running. Although Fox did not testify about the dog’s previous “success rate” in tracking humans, this testimony went to the weight and not the admissibility of the evidence. Gavin, 891 So.2d at 972. The training and qualifications of the dog and its handler were sufficient to establish the predicate for the admission of the testimony about the dog’s tracking and about the recovery of the shirt and the latex gloves. Therefore, even if Tariq-Madyun had properly preserved this issue for review, he would not be entitled to any relief on this claim of error.
For all the foregoing reasons, the judgment of the circuit court is due to be affirmed.
AFFIRMED.
WISE, P.J., and WINDOM, KELLUM, and MAIN, JJ., concur.

. Alabama courts have held that because Alabama’s rules regarding consolidation and joinder are very similar to the federal rules, consideration of federal cases is proper in determining whether consolidation was proper under Alabama’s procedural rules. Ex parte Hinton, 548 So.2d at 566.

. Trooper Fox initially identified the article of clothing found on the fence — State’s Exhibit 3 — as a jacket, but he and the prosecutor later identified the item consistently as a shirt. There is no allegation that two articles of clothing were found on the fence, and Tariq-Madyun has raised no objection to the fact that the item was first identified as a jacket.