WELCH, Presiding Judge.
Lonnie Bailey was indicted for and convicted of three counts of capital murder for his involvement in the shooting death of Melvin Key. Count I of the indictment charged Bailey with murder during the course of a first-degree burglary, committed while he or his codefendant, Harold Wayne Bailey, was armed with a gun, a violation of § 18A-5-40(a)(4), Ala.Code 1975; Count II charged Bailey with murder during the course of a second-degree burglary, a violation of § 13A-5-40(a)(4), Ala.Code 1975; and Count III charged Bailey with murder during the course of a robbery, a violation of § 13A-5-40(a)(2), Ala.Code 1975. Before the case was tried, the parties stipulated that the State would not seek the death penalty if Bailey was convicted of capital murder. Bailey was tried by a jury and was convicted of the three counts alleged in the indictment. The trial court imposed sentences of life imprisonment without the possibility of parole as to each conviction. This appeal follows. We reverse and remand for further proceedings.

Facts

The State presented evidence showing the following. On January 15, 2004, 71-year-old Melvin Key was killed when a single shot from a .410 shotgun was fired into his chest from 5 to 10 feet away. The front door of Key’s house appeared to have been forced open, and the latch was found on the floor several feet from the front door, at the threshold of a bedroom. Key’s body was found in his bedroom; he was in a kneeling position with his arms and elbows on the bed, his legs on the floor, and his feet against the wall. Key was facing the bedroom door. The medical examiner testified that the shotgun pellets entered Key’s heart, lungs, and liver, and that he died within several minutes. Key’s right hand also had been struck with shotgun pellets from the single shot. The medical examiner testified that Key could not have been holding anything in his right hand when it was struck because the pellets entered his hand through the tips of his fingers and his thumb, indicating that his fingers had been extended and he had his hand up in front of his body when he was shot.
A flashlight and a loaded .38 caliber handgun with the hammer pulled back were found on the bed near Key’s hands, beneath a bed sheet. Law-enforcement witnesses testified that they did not see the gun or flashlight during the investigation until they prepared to move Key’s body and they removed the sheet that had been covering his hands. The handgun was near Key’s left hand and the flashlight was near Key’s right hand; testimony established that Key was right-handed.
*174 An expended .410 shotgun shell was recovered at the scene. The scene was not processed for fingerprints or footprints, although a few items — including the expended shotgun shell — were sent to the Alabama Bureau of Investigation (“ABI”) for examination for latent prints. No latent prints were identified. A .38 caliber handgun was found on the table outside the bedroom of Steven Key (“Steven”), Key’s son. ABI agent William Burke testified about the crime scene and theorized:
“[t]hat someone kicked in the front door and made their way to Mr. Key’s bedroom door and in that time frame, Mr. Key had enough time to get out of bed and get in that position that you saw him on the photos and he had his gun and his flashlight pointing toward the bedroom door and which we figure the shot came from, he was confronting the home invader.”
(R. 536-27.)
Steven Key testified that he was 52 years old and that he had been living in the house with his father and was in the house when Key was killed. Steven testified that during the evening before the murder, Key had gone to a local auction house — 101 Auction — as he regularly did. Key returned home at approximately 11:30 and he brought his son a meal from the auction’s snack bar. Steven said that he and his father retired to their bedrooms after midnight. Steven further testified that he was awakened by a loud noise that sounded like his father might have fallen, so he got out of bed and walked toward his own bedroom door. The house was dark, he said, and his bedroom door was closed but not latched because an electrical cord was in the doorway. Steven said he saw nothing, but he heard the voice of a white male scream at his father, “ ‘Give it to me or I’ll blow your GD head off.’ ” (R. 727.) Steven said he heard only one voice. Steven testified that, within seconds, he heard a gunshot from what he believed to be a large-caliber firearm. After he heard gunfire, he heard footsteps as someone left the residence, bumping into tables as he left. No one opened Steven’s door before or after the shooting, and Steven did not see anyone leave the house. Steven said that he walked out of his bedroom, turned on a light in the living room, and picked up his father’s .38 caliber handgun that had been on a table beside his father’s chair. He then went to his father’s bedroom and discovered that his father had been shot and appeared to be dead. Steven said that he did not move anything or cover up the gun that was later found next to his father’s left hand. He telephoned emergency 9-1-1 for assistance.
Law-enforcement officers at the scene after the shooting noted that Steven’s demeanor was calm and that he did not appear to be upset, which the authorities found to be unusual. Steven was initially considered a person of interest in the murder, and he retained counsel on the afternoon of the murder. Steven declined to submit to a polygraph examination with the State’s examiner, but he later arranged to undergo a polygraph examination from an examiner he had hired. Law-enforcement authorities testified that Steven was eliminated as a suspect in the murder.
Steven testified that, when the murder took place, he did not know Bailey or Bailey’s brother, Harold Wayne Bailey (“Wayne”), but that he did know Bobby Joe Reeves and his wife, Tiffany Terry[1]. Steven said that Reeves sometimes helped Key load items for the auctions. Steven said that it was possible that Reeves and Terry had been to the Keys’ house, but if *175 they had been there, Steven had not been home at the time. Steven testified that Key carried cash at the auctions, and he usually kept the money in the left front pocket of his shirt. Steven said that he was not aware whether his father had any money on the night of the murder, and he was not certain that any money was taken from Key when he was killed.
On cross-examination Steven acknowledged that his father had received a telephone call on the day of the murder. Steven said he believed that the call was from the woman who cooked at the snack bar at the auction. Steven said that his father and the cook often teased one another and that when he heard his father say during the conversation that he was not worried about the son of a bitch, he was not concerned because he assumed they were referring in jest to the eook’s husband, who also worked at the auction.
Steven testified that he is left-handed.
Steven said on cross-examination that within a few weeks before the murder, he had considered buying a motorcycle from Bud Brewer, who was a friend of Key’s and who was at the auction on the night of the murder. Steven said that he had gone to Brewer’s house with a friend to look at the motorcycle when he was considering buying it. He acknowledged that he was not working at the time and that, if he had decided to purchase the motorcycle, his father would have had to give him the money for it. Steven said he had talked about the motorcycle with his father, but he had not asked his father for the money. He testified that he remembered calling Brewer on the day of his father’s funeral, but that he did not remember asking Brewer whether his father had fought with anyone at the auction on the night of the murder. Steven acknowledged that his father had a life insurance policy, and that he and his sister were the beneficiaries of the policy.
A diagram of the Keys’ house was admitted into evidence, and Steven agreed that the diagram showed that the person who entered the front door of the house on the night of the murder had to walk past his bedroom to reach his father’s bedroom. The murderer did not knock on his bedroom door or push the door open, he said.
ABI Agent Burke testified that the crime was unsolved for several months and that investigators had recovered no fingerprints, no trace evidence, and no blood or hair at the crime scene other than the victim’s. Burke testified that leads were developed in November 2004, when Bobby Joe Reeves and his wife, Tiffany Terry, were arrested on drug-related charges. Reeves was incarcerated in the Lawrence County jail, and he contacted Chief Lyndon McWhorter; McWhorter was the chief investigator at the Lawrence County Sheriffs Office. Reeves had been an acquaintance of Key’s, and he said he had information about Key’s murder. Reeves offered to cooperate with law-enforcement authorities in the murder investigation in exchange for the dismissal of the drug charges pending against him and his wife. Reeves implicated the Bailey brothers in the Key murder. Reeves provided information to investigators that led to the recovery of a .410 shotgun. A firearms expert determined that the .410 shell recovered at Key’s residence had been fired from that shotgun. Agent Burke testified about authorities’ next step in the investigation:
“[W]e provided Bobby Joe Reeves with a tape recorder. We needed some incriminating statements from either Lonnie or his brother, Wayne, and we gave Bobby Joe a tape recorder. Bobby Joe Reeves drove down to their house in Marion County and talked to them and *176 just brought up the murder to see if he could get any kind of reaction or incriminating statement to help focus on our case.”
(R. 542.)
Agent Burke testified that the tape recording of that conversation was garbled and inaudible.
Burke testified that Reeves “volunteered to go back again on his own,” and after he obtained a tape recorder from Chief McWhorter, Reeves went “back down there to try to get another incriminating statement from him.” (R. 543.) Only Wayne Bailey was involved in the second tape recording by Reeves, Burke said.
Burke testified that, next, he and other law-enforcement authorities used a four-wheeler owned by the sheriffs department as “bait as a reason for [the Baileys] to come to Lawrence County.” (R. 546.) Burke explained:
“We wanted to get Lonnie and Wayne Bailey to Lawrence County. We had one of our agents came in from Huntsville and he wired up Bobby Joe Reeves’ house. We would have more of a controlled atmosphere. So we wanted to get them to come to Lawrence County to Bobby Joe Reeves’ house where Bobby Joe Reeves can again talk to them about the murder and see if we can get some incriminating statements from them.
“We put the four-wheeler up there as an enticement or a reason for them to come to Lawrence County. And myself and Chief McWhorter, we parked at a house across the street from Bobby Joe Reeves’ in the driveway where we would have a full view of Bobby Joe Reeves’ house.”
(R. 545.)
While the Baileys were under surveillance with Reeves, the trio planned to steal the four-wheeler, but abandoned that effort and, apparently at Reeves’s suggestion, stole a tractor from a nearby farm-equipment dealer. Authorities arrested the Baileys after the tractor theft. The audio recording made during the surveillance was admitted into evidence, along with a transcript of the recording.
Tiffany Terry testified that on January 14, 2004, she was living with her common-law husband, Bobby Reeves, and their three children. Reeves died in October 2007, she said. Terry said that Reeves knew Key. Terry testified that Reeves had helped Key load and unload items for the auction, and that Reeves sometimes worked at the auction. She testified she had been to Key’s residence to help Reeves when he worked for Key. She estimated that the distance between her mobile home and Key’s residence could be traveled in approximately 15 minutes.
Terry testified that on January 14, 2004, the Baileys came to her mobile home around noon, and Lonnie Bailey told Reeves that he and Wayne needed to make some money. Terry said she heard Reeves tell Bailey that he knew someone who had money — Melvin Key. Reeves and the Baileys left in Reeves’s vehicle, and they returned at 5:00 or 6:00 p.m. Terry saw Reeves take a gun out of the back of his vehicle and give it to Wayne. She saw Wayne put the gun in the Bailey brothers’ van. Terry identified at trial the gun she said she saw Reeves give to the Baileys; that gun was the .410 shotgun that had been identified by other witnesses as the murder weapon. Terry said she had not seen Reeves with that shotgun before that day. The Baileys left the mobile home and Reeves came inside, she said.
Terry testified that at 10:00 or 11:00 that night, the Baileys knocked at their door. Reeves spoke to the men in the living room,- then the Baileys left and *177 Reeves went to bed. In a “[cjouple of hours or so” the Baileys returned to the mobile home, Terry said. Terry was in the bedroom she shared with Reeves when she heard someone turn the water on in the bathroom next to the bedroom, and she heard heavy breathing. Terry said that she then heard the bathroom door open, and she heard Bailey say, “Baby brother, you got to pull yourself together.” (R. 885.) Terry testified that she then heard Wayne say, “I had to do it.” (R. 885.) She heard no further conversation that evening, and the Baileys left a short time later. Terry testified that when Reeves came into the bedroom, he brought the .410 shotgun with him, and he put the gun in their closet. Terry said that she did not see the shotgun again, and she does not know what Reeves did with the gun.
Terry said that she heard on the news the following day that Key had been murdered, but she did not go to the authorities because, she said, she was terrified of Reeves and the Baileys. Terry began cooperating with the police in the investigation of Key’s murder in November 2004, after she and Reeves were charged with possession of a controlled substance and possession of drug paraphernalia. Terry understood that the charges against her would be dismissed in exchange for her cooperation. She said that, as part of Reeves’s agreement to cooperate, he wore a “body wire” and secretly made audiotapes of conversations with the Baileys.
On cross-examination, Terry acknowledged that she and Reeves had been arrested at their residence while their children were present after the drug task force conducted a search. She acknowledged that she was worried about what would happen to her children if she and Reeves were convicted and sent to prison. Terry also testified that Reeves was on probation at the time of their arrest on the drug-related charges. Terry testified that Reeves sold and traded guns.
Terry also testified on cross-examination that when she went to the local auctions she noticed that Key carried a large amount of cash. Terry further stated that “everybody” saw that Key carried a large amount of money, and that “[l]ots of people told him he needed to stop doing that.” (R. 919.)
Shirley Moreland testified that on January 14, 2004, her husband owned 101 Auction and she was responsible for the snack bar at the auction. Moreland stated that, at the time of Key’s murder, the auction was open on Wednesday and Saturday every week and that Key was there every time the auction was open. Moreland said that Key had been a good customer and that they had been friends. Moreland testified that on the night of the murder, Key came into the snack bar at approximately 9:30 p.m., he ordered a meal he ate there, and he ordered a meal he took with him when he left at 10:00 p.m.
Moreland testified that after Key left two men came into the snack bar carrying two telephones shaped like the M & M brand candy characters and one telephone shaped like a Coca Cola brand drink. The men were dirty and unshaven, she said, and their hair was long. She stated that when she saw them with the three telephones she commented to them that they were going to make a few telephone calls, and one man agreed with her. Moreland said she knew most of the people who came to the auction, but she had never seen these men. At trial Moreland identified Bailey as one of the men she saw at the snack bar. She viewed a photograph of Wayne Bailey and testified that he was the second man at the snack bar. More-land testified that she had heard Lonnie Bailey say, “He’s gone,” that night at the *178 snack bar, but she did not know who Bailey was talking about when he made the statement. (R. 973-74.) The men left the snack bar five minutes after Key left.
Moreland testified that the police interviewed her after Key was murdered, and they asked her whether she had seen Key with anyone at the auction and whether he had had an argument with anyone that night. Moreland did not tell them anything about the two men she had seen that night. She said she did not connect the men to Key’s murder when the police spoke to her. Moreland testified that after the Bailey brothers were arrested for Key’s murder and she saw their photographs in the newspaper, she remembered that she had seen the men in the snack bar that night. Moreland spoke with police officers again, and told them that she had seen the Baileys at the auction house on the night of Key’s murder.
Charles Brewer acknowledged that he was incarcerated in Alabama on a probation hold from Florida. He testified that in March 2004 he received the .410 shotgun — the murder weapon — from Reeves in exchange for a .22 rifle and $40 cash. Brewer said that he sold the gun to Mike Bolding. On cross-examination Brewer testified that he had never met Bailey and that he did not get the .410 shotgun from Bailey. Reeves brought the .410 shotgun to his house, Brewer said.
Earnest Parker, Jr., testified that he is a second cousin of the Bailey brothers. He stated that he visited the Baileys’ mother — his father’s aunt — in November 2004 because she was in ill health. Parker testified that the Bailey brothers were sitting on the porch of their mother’s house and that he spoke with them for approximately 10 minutes before he went inside to see his great aunt. Parker said that Bailey told him about his involvement in a crime:
“He just was telling me that Bobby Reeves had set up a thing to go rob a man and it didn’t go so well. They kicked in the door and the man was holding a gun and a flashlight. And Wayne told him to put the gun down three times and he didn’t, so he shot him.”
(R. 1053-54.)
Parker testified that after he had the short conversation with his second cousins, he visited with his great aunt for approximately five minutes, and then he left without having any additional conversation with the Baileys. Parker testified that he did not immediately report this information to the authorities because he was afraid of the Baileys.
Parker acknowledged that he first made these allegations to law-enforcement authorities in November 2005, within 20 minutes of being incarcerated following his arrest on two felony charges and one misdemeanor charge related to breaking into automobiles and causing damage to one of them. After Parker gave his statement to the authorities his bond was reduced, he said. Parker entered into a plea agreement with authorities before Bailey’s trial; in exchange for his testimony about the conversation with the Baileys he was allowed to plead guilty and received a suspended 18-month sentence and probation. Parker further testified that he had committed another crime after he pleaded guilty and that his probation had been revoked and he had been incarcerated.
On cross-examination Parker testified that, before November 2004, he had last seen Bailey a couple of months earlier. Parker stated that on the first day he was in jail in November 2005 he told the authorities that he knew something about the murder case. Parker testified that he had known Bobby Reeves for many years and had spoken to him on many occasions. *179 Parker said also that Reeves had been a close friend of Parker’s father. He acknowledged that he had probably told investigators that Reeves and the Baileys went to the auction on the night of the murder and that they met Key there.
Finally, on cross-examination Parker said that he had been under the influence of two drugs when he was interviewed by the authorities about his conversation with the Baileys and that he had told the authorities repeatedly during the interview that he needed to go to the hospital. Parker said he grabbed his chest because he was having difficulty breathing, and he was having a panic attack.
Lyndon McWhorter testified that he was chief investigator at the Lawrence County Sheriffs Office on January 15, 2004, and that he traveled to the Key residence to investigate the murder. McWhorter notified the ABI of the murder, and requested assistance from the agency. McWhorter testified about his observations of the crime scene, including the lack of any fingerprints and shoe prints of value in identifying Key’s killer. He interviewed Steven Key at the scene and again later that day at the sheriffs office. Steven told McWhorter that he had heard a bang and got out of bed to investigate, then telephoned authorities after he discovered that his father had been shot. McWhorter testified that he was aware that Steven had retained an attorney and that he had made plans to undergo a polygraph examination. McWhorter said that no evidence suggested that Steven was involved in his father’s murder.
McWhorter testified that he and ABI Agent Burke interviewed several people at 101 Auction, but they did not develop any leads from those interviews.
McWhorter testified that in November 2004 Bobby Joe Reeves was incarcerated in the Lawrence County jail and wanted to speak with McWhorter. McWhorter testified that Reeves gave him information about the murder weapon that led him to speak to Charles Brewer and then to Mike Bolding. McWhorter recovered the .410 shotgun from Bolding. He stated that after forensic testing revealed that the shotgun matched the shell and the wadding found at Key’s residence, the investigators began to focus on the Baileys. McWhorter testified, “[W]e began trying to gain information by audiotapes to get evidence against them.” (R. 1140.) Reeves and his wife had been arrested on drug-related charges, McWhorter said, and Reeves wanted to cooperate with the police so that the charges against him would be dis-⅞ missed and he would be released from jail. Reeves agreed to wear a hidden transmitter and to have hidden audio surveillance equipment placed in his house to record his conversations with the Baileys. On one of those occasions the Baileys and Reeves stole a tractor from a supply company, and the Baileys were arrested, McWhorter said. The tape recording of the conversation at Reeves’s house was admitted into evidence and played for the jury, and a transcript of the recording was admitted into evidence and was distributed to the jury before the tape was played.
McWhorter stated that Bailey was interviewed at the jail after he was arrested for the tractor theft. Bailey calmly answered the investigator’s questions about the theft of the tractor, but he became agitated and angry when the investigator showed him the .410 shotgun and began asking questions about Key’s murder.
On cross-examination McWhorter acknowledged that he had instructed Reeves to attempt to elicit statements from Bailey about Key’s murder while the Baileys were being secretly audiotaped. McWhorter agreed that the transcript of the audiotape reflected that Bailey stated that he did not *180 want to take the four-wheeler unless it was easily accessible because he did not want to have a “shootout” over it. McWhorter also acknowledged that when Reeves said the last shootout led to drama and they were still trying to charge “Steve” with that, Bailey replied, “ ‘I don’t know what you are talking about.’ ” (R. 1173-74.) He also stated that, before Reeves and his wife began to cooperate with the authorities, they had no physical evidence or other information to support Bailey’s arrest for the murder. McWhorter testified that the shotgun was recovered from Mike Bolding, that Bolding had obtained the weapon from Charles Brewer, and that Brewer had received the weapon from Reeves. McWhorter said he was unable to establish any connection between Bailey and either Brewer or Bolding.
McWhorter stated that Reeves began providing information about the murder weapon and about the Baileys after Reeves was arrested and charged with felony drug possession following a search of his residence pursuant to a warrant. McWhorter was called to the house during that arrest because the drug task force had recovered two shotguns during the search and one of the shotguns had been reported stolen in Cullman County. McWhorter gave the stolen shotgun to an investigator from Cullman County. Neither Reeves nor Terry was charged with theft of property or with receiving stolen property as a result of that incident, he said.
Christopher Waldrep testified that he was a deputy with the Lawrence County Sheriffs Department and that on May 6, 2005, he transported Lonnie and Wayne Bailey from the county jail to the county courthouse and then back to the jail. During the trip from the courthouse to the jail he heard the Baileys make several statements after they saw a man they identified as Bobby Joe Reeves at an intersection traveling in another car. Waldrep said that Bailey referred to Reeves with a profanity and that Bailey and Wayne became angry as they looked at Reeves, so Wal-drep drove away from the intersection. Waldrep testified that Wayne said to Wal-drep, “[Pjull over there and hand me your gun and I’ll show you what to do with it. I’ll take care of him.” (R. 1109.)
Waldrep testified about the rest of the conversation:
“And then Lonnie — then they started a conversation back and forth with one another. Lonnie, said, ‘Why, what are you going to do?’ And with a big smile, Wayne said, ‘Say hi.’ And they had a small laugh and then right at that point the mood changed very quickly. And Lonnie said, ‘No, no, we’ve never killed anybody before and we’re not going to start now.’ And then he said, ‘That piece of shit would say anything to stay out of jail.’ And after that then Wayne said, T don’t think I need a gun, I could beat him to death with my bare hands.’ And the rest of the conversation back and forth up to the jail was about how they were going to get compensation for false imprisonment and things like that.”
(R. 1109-10.)
Waldrep testified on cross-examination that he did not hear Bailey threaten Reeves or anyone else.
After presenting the foregoing evidence the State rested.
Bailey presented testimony from his wife, Tawana Bailey (“Tawana”). Tawana testified that she had formerly been married to the brother of prosecution witness Earnest Lee Parker, Jr., and that they had two children. Tawana stated that she had maintained contact with the Parker family because of the children. She testified that she had had conversations about this case with Parker. She stated that Parker had *181 been incarcerated for a time and that she spoke with him after he was released from jail. She testified that Parker told her that he had been released from jail because he gave authorities a statement about the Baileys’ involvement in Key’s murder, and he said that the information he gave in the statement had come from Reeves. Tawana testified that she had had another conversation with Parker a couple of weeks before the trial. She said that Parker told her that he had already given a statement based on the information supplied by Reeves and that he could not make himself look like a liar. Tawana testified on cross-examination that, although she had known Bailey for years, she became romantically involved with him only after he was incarcerated for Key’s murder, and they married while Bailey was in jail. Tawana also testified that Reeves and Earnest Lee Parker, Sr., had been close friends, and she had seen Reeves visiting with the elder Parker when she was at the Parker home. The junior Parker was in the home on some of those occasions, Tawana stated.
Chief Lyndon McWhorter testified for the defense that he was aware of an investigation into the death of Bobby Joe Reeves, and that the investigation revealed that the death was not the result of a homicide. He also testified that as part of the investigation of Key’s murder, Bailey’s house and vehicle were searched. No items related to Key’s murder was found in either search, McWhorter said.
Defense counsel presented '’testimony from Elbert Lad Roberts in an apparent attempt to show Tiffany Terry’s bad reputation for truth and honesty in the community in which she lived, but Roberts testified that he was not familiar with others in her community. Roberts testified that he had been to Terry’s house on approximately 10 occasions and that he had gone there to purchase drugs.

Analysis

Bailey argues that the trial court erred to reversal when it allowed the State to introduce evidence of his involvement in the attempted theft of a four-wheeler and the theft of a tractor, both of which, he says, were initiated and staged by the investigators and Bobby Joe Reeves. Bailey also argues that the trial court erred when it permitted the State to present tape-recorded conversations between the Baileys and Reeves and a transcript of the conversation that included what the State argued was a plan for another home-invasion robbery. Bailey contends that admission of the evidence violated Rule 404(b), Ala. R.Evid., because, he says, it was evidence of other crimes or wrongs intended to show his bad character and that the prejudicial impact of that evidence warrants reversal of his convictions. Bailey also argues that the trial court erred when it permitted the State to argue to the jury, based on the recording made by Reeves, that Bailey was planning another home-invasion robbery.
The State argues that two witnesses— Agent Bill Burke and Chief Lyndon McWhorter — testified about the attempted theft of the four-wheeler and the theft of the tractor and that Bailey objected only to the initial testimony from Burke. Therefore, the State contends, the subsequent admission of the same testimony from McWhorter without objection from Bailey rendered innocuous any alleged error in Burke’s testimony. The State argues that Bailey failed to object to the prosecutor’s allegedly improper argument — that Bailey had made plans for another home-invasion robbery because “that’s who he is” — and that Bailey did not object on Rule 404(b) grounds to the admission of the tape-recorded conversation *182 and the transcript of the conversation. Therefore, the State argues, those claims were not preserved for review.
A. Prese'rvation of the issues
Bailey filed a pretrial motion in limine, and he requested that the court preclude the State from presenting testimony or other evidence relating to any other crime, wrong, act, or omission, including evidence of his alleged participation in the attempted theft of the four-wheeler and the theft of the tractor, and he cited Rule 404(b), Ala. R.Evid. The trial court held a hearing on the motion and ordered the State to avoid reference to any indictment or pending charge related to the thefts but otherwise denied the motion in limine. When Agent Burke testified at trial about the sheriffs office placing the four-wheeler near Bobby Joe Reeves’s residence as “bait” to lure the Bailey brothers to Lawrence County, Bailey objected and argued that testimony about the attempted theft of the four-wheeler and testimony about the theft of the tractor were unrelated to the crimes for which Bailey was being tried, that the incidents occurred 11 months after Key’s murder, that the evidence was extremely prejudicial and was prohibited by Rule 404(b), and that its admission would deny him his right to a fair trial. The State argued:
“Judge, the evidence that we are going to present is so interwoven with this attempted theft of the four-wheeler or set up of the theft of the four-wheeler— actually the four-wheeler was never stolen, and the theft of a tractor. It really can’t be separate[d] especially since we’ve come to introduce an undercover tape that was taken at the time that this occurred.”
(R. 548.) The trial court overruled the objection, apparently on the ground that evidence of the theft explained how Bailey was taken into custody. When McWhorter testified about the theft of the tractor, Bailey objected on the same grounds as he had raised earlier. The trial court overruled the objection and stated: “I’ll note your continuing objection on that same basis on this line of testimony.” (R. 552.)(Emphasis added.) Therefore, Bailey preserved for review his claim that the trial court erred when it allowed testimony about the attempted theft of the four-wheeler and the theft of the tractor. Bailey did not need to object further to the line of inquiry during McWhorter’s testimony to preserve the argument for appellate review.
The State also claims that Bailey failed to preserve for review the alleged error in the admission of the conversation tape-recorded by Bobby Joe Reeves and the transcript of that conversation because, it says, Bailey did not object on Rule 404(b) grounds at trial. The record does not support the State’s waiver argument as to this evidence, either.
During McWhorter’s testimony the prosecutor introduced the tape recording of Reeves’s conversation with the Baileys — along with the transcript of the recorded conversation — and Bailey objected, in part on the ground that the tape included discussions of other crimes. The trial court clearly understood the basis of the objection:
“[DEFENSE COUNSEL]: Well, part of the things, like some of this other stuff, thére’s so much stuff intertwined. For example, discussions about another burglary or robbery somewhere else, discussions about the tractor, four-wheeler.
“THE COURT: So you’re saying its prejudicial impact is greater than its probative value. What else?
*183 “[DEFENSE COUNSEL]: You’ve already ruled basically—
“THE COURT: But what else? Is there any other objection? I just want you to get your objections on the record.
“Anything else?
“[DEFENSE COUNSEL]: Object to relevance.
“THE COURT: Okay. Anything else?
“[DEFENSE COUNSEL]: No.
“THE COURT: All right. I’ll overrule objection and admit it.”
(R. 1150-51.) When the trial court admitted the transcript into evidence, it stated that it was doing so over the objections Bailey had previously made, and it granted Bailey a continuing objection. (R. 1154.)
“When the trial court understands the basis for defense counsel’s objection, a reviewing court should not be ‘too strict in its application of the waiver principle.’ ” Gamble v. State, 699 So.2d 978, 979 (Ala.Crim.App.1997) (quoting Ex parte Webb, 586 So.2d 954, 956 (Ala.1991)). The record as a whole clearly establishes that Bailey objected to the tape recording and the transcript, in relevant part, on the grounds that they included a discussion of other crimes and because their probative value was outweighed by their prejudice — which are the hallmarks of an objection based on Rule 404(b). Nothing more was required to preserve Bailey’s argument for appellate review.
B. Admissibility of the collateral-act evidence
Having determined that Bailey preserved for review his objections to the admission of evidence that implicated him in the planning or perpetration of other crimes, we consider whether the admission resulted in reversible error. As we stated in Tariq-Madyun v. State, 59 So.3d 744 (Ala.Crim.App.2010):
“ ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). The rule applies to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998).”
59 So.3d at 755.
Evidence of prior or subsequent collateral bad acts and crimes is generally inadmissible.
“ ‘ “On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he. is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.” ’ Pope v. State, 365 So.2d 369, 371 (Ala.Crim.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01. (3d ed.1977).”
Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App.1986), quoted in Ex parte Jackson, 33 So.3d 1279, 1284 (Ala.2009).
Evidence of collateral bad acts is “presumptively prejudicial because it could cause the jury to infer that, because the defendant has committed crimes in the past, it is more likely that he committed the particular crime with which he is charged — thus, it draws the jurors’ minds away from the main issue.” Ex parte *184 Drinkard, 777 So.2d 295, 296 (Ala.2000). The Alabama Supreme Court recently stated:
“In Moore v. State, 49 So.3d 228 (Ala.Crim.App.2009), the Court of Criminal Appeals stated the following regarding Rule 404(b), Ala. R. Evid., which addresses the admissibility of evidence of collateral bad acts:
“Rule 404(b), provides:
“ ‘ “Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident .... ”
“ ‘The Alabama Supreme Court has “held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.” Ex parte Drinkard, 111 So.2d 295, 302 (Ala.2000) (citing Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983)). This court has explained that “[o]n the trial for the alleged commission of a particular crime, evidence of the accused’s having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused’s conformity therewith.” Lewis v. State, 889 So.2d 623, 661 (Ala.Crim.App.2003) (quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (5th ed.1996)).
“ ‘ “ ‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ”
“‘Ex parte Jackson, 33 So.3d 1279, 1284-85 (Ala.2009) (quoting Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting in turn C. Gamble, McElroy’s supra, § 69.01(1)).’
“49 So.3d at 232 (emphasis added).”
Ex parte Billups, [Ms. 1090554, Dec. 30, 2010] — So.3d -, -(Ala.2010).
“Thus, the purpose of the rule is to protect the defendant’s right to a fair trial by preventing convictions based on the jury’s belief that the defendant is a ‘bad’ person or one prone to commit criminal acts. See Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983).”
Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (3d ed.1977).
Although collateral-act evidence is generally inadmissible and presumptively prejudicial, the State is not prohibited in all cases from presenting it. Rule 404(b), Ala. R. Evid., provides, in pertinent part:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....”
Even though evidence of a collateral bad act fits into one or more of the exceptions to the general rule of exclusion so the act may be admissible, that alone *185 does not render it admissible at trial. For collateral-act evidence to be admissible for one of the “other purposes” in Rule 404(b), there must be a real and open issue as to that other purpose. E.g., Draper v. State, 886 So.2d 105, 117 (Ala.Crim.App.2002). This Court has stated that “not only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice.” Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985), quoted in Draper v. State, 886 So.2d 105, 120 (Ala.Crim.App.2002). This Court further explained:
“ ‘ “Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’” Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985), quoting United States v. Turquitt, [557 F.2d 464] at 468-69 [(5th Cir.1977) ].”
Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App.1986).
Bailey argues, as he did at trial, that evidence of the attempted theft of the four-wheeler, the theft of the tractor, and the recording and transcript of the conversation with Reeves should not have been admitted, that their admission resulted in substantial prejudice, and that the outcome of the trial was affected by the improperly admitted evidence. We agree, and we hold that the trial court erred when it permitted extensive, detailed testimony about Bailey’s collateral acts.
The State’s primary argument is that Bailey failed to preserve the arguments for review, an argument we have rejected for the reasons discussed above. Its only additional substantive argument is that the collateral-act evidence was properly admitted because, it says, that evidence explained the reasons for the investigators’ actions and explained how Bailey was apprehended. The State relies on cases holding that evidence of an officer’s conversations and actions related to the apprehension of the defendant does not constitute inadmissible hearsay. None of the cases stand for the proposition that detailed testimony about collateral crimes committed during a defendant’s arrest months after the crime for which the defendant was being tried — especially when one of the collateral crimes was set up by the investigators and their cooperating witness and when the discussion and purported planning of a future crime was also initiated by the cooperating witness — is admissible.
During the pretrial hearing on the motion in limine, the trial court stated that evidence about the attempted theft of the four-wheeler and the theft of the tractor “appears to be [Rule] 404(b) type evidence” and asked the prosecutor for a response to the motion. The prosecutor argued:
“Judge, it’s interwoven with the evidence that we intend to offer and it’s more so in this case because we intend to offer the undercover tape or an undercover tape that was taken during the alleged theft of the four-wheeler or the tractor, however you want to term it during that time. And it also explains how the defendant came to be in custo *186 dy. And it’s going to be an integral part of the evidence that we offer and incapable really of separation from the other evidence.”
(R. 275.)
The trial court ordered that the State make no reference to a pending charge related to those collateral acts but otherwise denied the motion in limine. When Agent Burke began to testify about the investigators working with Bobby Joe Reeves and parking a four-wheeler that belonged to the sheriffs department near Reeves’s house as an enticement or “bait” to lure the Baileys to come to Lawrence County, Bailey objected:
“This goes to the motion in limine regarding other crimes, wrongs or acts. The district attorney is attempting to elicit testimony that the defendant was involved in or planned the theft of a four-wheeler which is going to be immediately followed by testimony regarding the theft of a tractor. And those incidents occurred in November of 2004. They are wholly and completely unrelated to the burglary of Melvin Key’s home or to the murder of Melvin Key. They are evidence of other crimes, wrongs or acts and prohibited under Rule 404 and we would object.”
(R. 547-48.)
The prosecutor again argued that the evidence he intended to present was “so interwoven with this attempted theft of the four-wheeler or set up of the theft of the four-wheeler — actually the four-wheeler was never stolen, and the theft of a tractor,” that it could not be separated. (R. 548.) Bailey then argued, in relevant part:
“Clearly this is eleven months later, wholly and completely unrelated. To allow them to elicit testimony of the defendant participating in other completely unrelated thefts that they set up, that they sent their own informant down there to bring him up there to do is extremely prejudicial and denies the defendant’s right to a fair trial.”
(R. 549.)
Over Bailey’s objections, the trial court permitted the State to elicit extensive detail — through its lead witness — about the Baileys’ attempt to steal the four-wheeler, then “[changing] their mind about stealing the four-wheeler,” and driving in Bailey’s car to a farm-supply business, where Bailey “hot wired the tractor.” (R. 551-52.) Agent Burke then testified that, even though investigators had had no intent to arrest the Baileys that night, they arrested them because, he stated: “Once they stole the man’s tractor, we had to get the tractor back.” (R. 552.) Chief McWhorter later testified about the details of these collateral crimes and about Bailey’s arrest for the theft of the tractor. McWhorter stated that he and the other investigators would not have arrested Bailey for murder at that time, “However, when it was a citizen’s property being taken, I couldn’t let that just leave the county.” (R. 1145.)
Bailey correctly argued at trial, and he continues to argue on appeal, that the testimony about the four-wheeler and the tractor had no relevance to the murder of Melvin Key, a murder that occurred 11 months earlier. The detailed testimony about these crimes contributed no evidence proving that Bailey was involved in Key’s murder. Rather, it established, at most, that Bailey could be lured by Bobby Joe Reeves to participate in thefts of unattended vehicles. The testimony about the collateral acts was inadmissible, it did not fit within one of the exceptions of Rule 404(b), Ala. R. Evid., to the general exclusionary rule, and the trial court erred when it permitted the State to elicit testimony about the crimes.
*187 The State asserts that the testimony about the thefts was properly admitted because, it says, it was interwoven with its other evidence and explained the reasons for the investigative actions and for Bailey’s arrest. We disagree. Even if the State needed to present testimony that it had arrested Bailey in Lawrence County on an unrelated crime, certainly the extensive details of the attempted theft of the four-wheeler “bait” and Bailey’s “hot wiring” of the tractor — evidence that was presented by two law-enforcement witnesses — was probative of nothing other than Bailey’s involvement in criminal acts unrelated to the murder for which he was on trial. Rather than simply explaining how Bailey came to be in custody, the testimony from the two witnesses appears to have been intended to suggest to the jury that Bailey was of bad character and that citizens needed to be protected from him. This use of collateral-act evidence is precisely the use forbidden by the exclusionary rule, and the trial court erred when it allowed it into evidence.[2]
The same rationale applies to the admission of the tape-recorded conversations of Bailey and others at Reeves’s residence before the tractor theft took place. Bailey objected to the evidence because, he said, it contained discussions about the tractor and the four-wheeler, and it also included discussions about a possible future robbery or burglary, and that the evidence was irrelevant and more prejudicial than probative. (R. 1150-51.) The State argued that the tape recording was also admissible because it included an admission against interest.
A small portion of the recording was arguably inculpatory and relevant because it referred to a shootout and a charge against “Steve,” but it also included exculpatory statements from Bailey and his brother indicating they did not know about a shootout:
“[BAILEY]: MAKE SURE THAT FOUR WHEELER IS SITTING OUT THERE WHERE WE CAN’T GET IT. CAN’T GET IT, FUCK IT AIN’T NO SENSE IN FUCKING WITH IT. HATE TO GO UP THERE AND HAVE A SHOOTOUT OVER A FOUR WHEELER.
“[REEVES]: WE DON’T NEED TO BE IN ANY MORE GOD DAMN SHOOTOUTS, LONNIE BAILEY. LAST GOD DAMN SHOOTOUT LEAD TO A DRAMA. THEY STILL TRYING TO CHARGE THAT MOTHER FUCKER WITH THAT.
“[BAILEY]: HUH?
“[REEVES]: THEY STILL TRYING TO CHARGE STEVE WITH THAT.
“[BAILEY]: GOOD.
“[REEVES]: STEVE.
“[WAYNE]: I DON’T KNOW WHAT.
“[BAILEY]: I DON’T KNOW WHAT YOU ARE TALKING ABOUT.”
(C. 339.)(Capitalization in original.)
Although the quoted portion of the recorded conversation was perhaps admissible, the remainder of the recording and *188 the transcript should have been redacted as being irrelevant and prejudicial. The recording and the transcript consisted of profanity-laced, disjointed conversations between Reeves, Tiffany Terry, the couple’s children, and the Baileys; the transcript includes comments about a vast array of topics, including eating nuts, threats to spank crying children, the weather, pain pills, the tractor and four-wheeler, and about “hitting” a wealthy businessman. At most, Reeves’s brief statements about a prior shootout might have been intended to refer to Key’s murder, but Bailey’s responses did not implicate him in Key’s murder. The remainder of the tape-recorded conversations and the transcript were entirely irrelevant to the murder and were extremely prejudicial in that they included Reeves’s initiation of what the State later claimed to be a discussion of a future robbery or burglary of a businessman, and Bailey’s statements that if the man had several businesses, he had to have money somewhere and he probably had a vault in his house. (C. 337-38.)
Admission of the rambling, often profane conversation among children and four adults provided additional evidence that appears to have been intended primarily to demonstrate to the jury that Bailey was of bad character and was willing to engage in criminal pursuits. As was the case with the evidence about the four-wheeler and the tractor, this evidence was not admissible, and it did not come within any exception to the exclusionary rule. The trial court erred when it allowed evidence of the collateral acts.
Even if we had determined that evidence about the four-wheeler, the tractor, and the conversations recorded at Reeves’ residence fit within an exception to the exclusionary rule, we would nonetheless hold that the collateral-act evidence was inadmissible because it was not reasonably necessary to the State’s case and because its probative value was far outweighed by its prejudicial value. See, e.g., Ex parte Jackson, 33 So.3d 1279, 1286 (Ala.2009) (holding that to admit evidence of prior bad acts under Rule 404(b), Ala. R. Evid., the State must demonstrate “that the evidence was reasonably necessary to its case”). None of the collateral-act evidence established any element of the crimes for which Bailey was being tried, and none of the evidence was necessary to the State’s case. Even if, as the prosecutor argued, some testimony was necessary to show how Bailey came to be in custody, the prosecutor could have asked limited fact-based questions to elicit that information.
The State did not need to present detailed testimony about any other crimes, particularly when the State and its cooperating witness, who was deceased at the time of trial, admittedly planted the four-wheeler to lure Bailey into another county and the cooperating witness himself initiated discussion of a possible home-invasion robbery or burglary. Rule 403, Ala. R. Evid., states: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” A balancing of the relevant factors leads only to the conclusion that the collateral-act evidence was inadmissible. The unfair prejudice here is clear. The State presented not only the fact of the theft and the discussion about a businessman having money, perhaps in a vault, but it presented extensive details about the events surrounding the attempted theft of the four-wheeler and the theft of the tractor. The tape-recorded conversation included a vast amount of confusing topics of discussion in *189 addition to the impermissible discussion of a possible future crime and confused the issues relevant to the trial for Key’s murder and likely caused the jury’s attention to be diverted from its duty to make a decision about Bailey’s guilt based on evidence that was actually relevant to that murder. The prejudice to Bailey that resulted from the collateral-act evidence was substantial.
Furthermore, the prosecutor’s likely intention for presenting the collateral-act evidence — to convince the jury that Bailey was a man of bad character who had committed other crimes and who had planned a robbery or burglary at another man’s home, thus making it more likely that he had also committed the murder of Melvin Keys — was demonstrated by the prosecutor’s closing argument. He argued not only that Bailey had been arrested for stealing the tractor, but also that the surveillance tape provided evidence of Bailey’s intent to commit another, similar crime: “On that transcript in that conversation, they’re planning another home invasion robbery just like they did with Melvin Key. It’s clear.” (R. 1266.)(Emphasis added.) After defense counsel objected to the argument and the trial court overruled the objection, the prosecutor continued with that assertion that Bailey had a plan to commit another crime:
“On that tape, they are talking about another home invasion robbery. Bobby Reeves brought it up and the defendant is right there along with him talking about it. I don’t know how many times he says on that tape he’s got a vault, he’s got a vault, minus all the cuss words, he’s got a vault, talking about him having security, he got a son with a gun. They are planning another home invasion robbery. That’s what he does.”
(R. 1267-68.)(Emphasis added.)
In his rebuttal argument to the jury the prosecutor again argued that the surveillance recording demonstrated that Bailey was planning another, similar crime:
“What did the evidence show you in this case ? If you look at this transcript and it tells a lot, okay. If you look at this transcript, you can see them setting up another robbery. Bobby Joe Reeves starts talking about it. And I’m not going go through it, but it starts here and he’s talking about three hundred and fifty dollars and four hundred thousand dollars, but look through the transcript. Lonnie Bailey is just right there with him. He’s talking about the vault, he’s talking about it being in the house. He’s talking about robbery. That’s what he does.”
(R. 1313-14.)(Emphasis added.)
The State’s use of the inadmissible evidence, particularly the entire discussion about a possible home-invasion robbery — a discussion initiated and directed by Reeves, the State’s cooperating witness— was especially prejudicial because its only probative function was to show Bailey to be of bad character, with a propensity to commit the type of crime for which he was being tried. This was precisely the type of evidence forbidden by the general exclusionary rule, which prevents the introduction of collateral bad acts for the sole purpose of suggesting that the defendant is more likely to be guilty of the crime in question. The trial court far exceeded its discretion when it allowed the State to introduce the collateral-act evidence.
Finally, we hold that the trial court’s errors cannot be considered harmless error under the circumstances of this case. Rule 45, Ala. RApp. P., provides, in relevant part, that no judgment may be reversed on the ground of the improper admission of evidence unless, after an examination of the entire cause, it appears to *190 the reviewing court that the error has probably injuriously affected substantial rights of the parties. See, e.g., Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (holding that the proper harmless-error inquiry asks whether, absent the improperly introduced evidence, it is clear beyond reasonable doubt that the jury would have returned a guilty verdict); Moore v. State, 49 So.3d 228 (Ala.Crim.App.2009) (“[Tjhis court cannot say that the State’s evidence was so overwhelming as to render the improper admission of Moore’s prior conviction harmless beyond a reasonable doubt.”).
Not only did the trial court erroneously allow substantial, detailed testimony about collateral bad acts and not only did the prosecutor rely on that testimony to encourage the jury to return guilty verdicts, but the actual evidence of Bailey’s guilt was far from overwhelming or ironclad. There was no physical evidence to connect Bailey to the crime scene. The murder weapon recovered months after the murder was connected to Bobby Joe Reeves, who had the gun before and after the murder and who sold the weapon after the crime. Bailey did not know Key. Reeves and Terry had known Key, knew that he carried a substantial amount of money, and had been to his house. The investigators initially suspected that Key’s son, Steven, had been involved in the murder based, in part, on his lack of emotion at the crime scene, even though he had allegedly been present in the house when his father was murdered and he discovered his father after the shooting. Steven retained counsel the day of the murder and submitted to a lie-detector test with a private examiner he later hired. It appears that the murderer was familiar with Key’s house, because he passed by Steven’s closed bedroom door and went directly to Key’s bedroom and killed him there.
The crime scene was perplexing because, although Key was right-handed, a handgun was found next to his left hand while the flashlight was found next to his right hand. Furthermore, the medical examiner testified that Key could not have been holding anything in his right hand because the wounds to his fingers indicated that his fingers had been outstretched when the shotgun pellets entered them. Key’s hands, the handgun, and the flashlight were under a sheet when the authorities found Key’s body. Steven said that he did not cover his father’s hands with the sheet after he was shot.
The murder investigation yielded no leads for months, until Reeves and Terry were incarcerated on drug charges and then began offering information to investigators implicating Bailey and exculpating themselves. The only other witness who testified that Bailey was involved in the murder was Earnest Parker, Jr., a longtime friend of Reeves’s, and he, too, only provided information nearly two years after the murder and he did so only after he was incarcerated and seeking a favorable treatment from law-enforcement authorities in exchange for information. A defense witness testified that Parker’s father had been good friends with Key and that Parker told her that the statement he made to the police had been based on information Reeves had given him. The State’s case against Bailey was weak, at best.
Furthermore, the State attempted to bolster its weak case against Bailey by presenting detailed evidence of his involvement in criminal acts he was admittedly lured into by the investigators and their cooperating witness, Reeves, and by his purported planning of another crime against a wealthy businessman. Bailey was unfairly prejudiced by the State’s presentation of that evidence and addition *191 ally by the State’s argument that Bailey was planning to commit another home-invasion crime because “that’s who he is” and “that’s what he does.” In Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991), the appellant argued that fingerprint evidence and swabs from the victim’s body were irrelevant and should not have been admitted, and that the evidence prevented him from receiving a fair trial. This Court found no reversible error in the trial court’s admission of that evidence:
“We fail to see the relevance of this evidence in this particular case. However, our review of the entire record shows that the prosecution did not take unfair advantage of either this evidence or the fingerprint evidence in an attempt to confuse the jury or in an effort to imply the inference of facts which did not exist. We do not find that the State attempted to use this evidence to bolster a weak case against the defendant. The admission of merely immaterial and not prejudicial evidence is not reversible error.”
577 So.2d at 511-12.
We are unable to reach the same result here that we reached in Kuenzel. The errors in this case resulted in the jury’s considering a substantial amount of improper collateral evidence that diverted the jurors’ minds from the main issue of Bailey’s criminal responsibility for Key’s death, and it had an irreversible impact on the jury’s decision-making process. Through the admission of the improper evidence and the prosecutor’s argument about the evidence the prosecutor implicitly tried Bailey for the attempted theft of the four-wheeler it admittedly placed with the intent to lure Bailey, for the theft of the tractor, and for the purported plan to commit another home-invasion robbery or burglary involving a victim similar to Key. The prejudice that resulted was substantial and the admission of the evidence cannot be considered harmless error. Bailey was denied his right to a fair determination of his guilt. We therefore reverse the convictions and remand the cause for further proceedings.
REVERSED AND REMANDED.
WINDOM and KELLUM, JJ., concur.

. In some parts in the record dais person is referred to as "Tiffany Terry Parsons.”

. Although the State does not argue that the collateral-act testimony fit within the res ges-tae exception to the general rule of exclusion, we note that, even if the State had made that argument, the argument would likewise fail to persuade because that exception applies only when the collateral crimes or acts are contemporaneous with the charged crime and are part of the same transaction or chain of events. E.g., Dosier v. State, 72 So.3d 50 (Ala.Crim.App.2010). The thefts and the discussion of a possible robbery or burglary occurred nearly a year after the murder and were not part of one continuous chain of events related to the murder. Therefore, even if the State had argued that the collateral crimes were admissible as a res gestae exception, the State would have been incorrect.